Filed 1/17/25  P. v. Cash CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>KEITH LAMONT CASH,<br><br>    Defendant and Appellant. | F085399<br><br>(Super. Ct. No. BF173152A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John D. Oglesby, Judge.

Dale Dombkowski, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Christopher J. Rench and R. Todd Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Keith Cash was convicted by a jury of three sex offenses arising out of a relationship he had with a female high school student.  Cash was serving as the girl's basketball coach when the relationship started.  He raises three issues on appeal.  He first

contends the trial court erred by making comments that undermined the prosecution's burden of proof. He next argues the court's comments violated his right to remain silent. He also claims the court coerced the jury to reach their verdicts. Finally, he claims the cumulative effect of the errors requires reversal. We affirm.

## STATEMENT OF THE CASE

Cash was charged in an amended information with oral copulation with a minor (Pen. Code,[1] § 287, subd. (b)(2); count 1), contacting a minor with intent to commit a sexual offense (§ 288.3; count 2), and meeting a minor with intent to commit a sexual offense (§ 288.4, subd. (b); count 3). The information also alleged a series of aggravating circumstances under California Rules of Court, rule 4.421.

A jury convicted Cash on all counts, and the trial court in a bifurcated proceeding found the alleged aggravating circumstances true. The trial court imposed a term of two years on count 1 and imposed concurrent terms on counts 2 and 3. Cash was also required to register for life under section 290.

## FACTS

### I.     Prosecutions' case

Jane Doe was born in October 1997 and was 24 years old at the time of trial. From August 2011 to December 2012, she attended Ridgeview High School in Bakersfield for her freshman year and the first semester of her sophomore year. She was between 13 and 15 years old when she attended Ridgeview.

Doe played basketball at Ridgeview and made the junior varsity team as a freshman. Cash was the junior varsity coach, and Doe played on his team her freshman and sophomore years. Cash was born in July 1989.

---

[1] Undesignated statutory references are to the Penal Code.

2.

When Doe was 14 years old, Cash began texting her. They began texting frequently and the messages turned sexual. Cash often urged Doe not to tell anybody about their relationship as it would ruin his reputation and career.

Doe recalled her and Cash's first physically intimate encounter, which was near the end of 2011. Cash took her to the school's training room, locked the door, and rubbed his erect penis on her vagina, skin to skin. They stopped when they heard the door rattle and pretended like Cash was checking Doe for an injury.

A few weeks later, on January 3, 2012, Doe and Cash had sex on campus. Doe was still 14 and she had never had sex before. Cash led Doe to the boys' locker room and locked the doors. He inserted his erect penis into her vagina, which was painful for her and made her bleed afterward. The two left the locker room through separate doors.

By the time they first had sex, Cash was telling Doe he loved her. Doe testified they had sex "many times after that," and she estimated it was three to four times a week. Sometimes Cash drove Doe from campus to a secluded area to have sex in his car. Doe estimated that they probably had sex a total of 50 times.

Once, Doe ditched school and went with Cash to his parents' house, where he was living. They had intercourse at the parents' house, and Doe orally copulated him for the first time. Doe also once became scared she may be pregnant, but a test confirmed she was not.

Doe and her family moved to Fresno in December 2012. Though she was then at a different school, she and Cash continued communicating. She sent him nude photographs at his request.

In November or December 2015, when Doe was 18 years old, she and Cash saw each other again. Cash told her he would be in town for a basketball tournament and said she should come see him. Doe met him at his hotel where they had intercourse and oral sex. This was the last time they were together. This last meeting with him made Doe

feel uncomfortable as it was "kind of like a triggering," though she testified that she still had feelings for him.

Cash and Doe continued texting through 2016, and in 2017 Doe blocked his number. Near the end of their texting relationship, Cash messaged her asking why she did not speak to him anymore, and she said she did not feel there was a need to. Cash texted, "Wow. So after all we've been through you're done with me." He also messaged, "I've never dismissed you like this. I stopped things between us at one point because it almost cost me my career and when it was safe I came back to you."

Doe reported her and Cash's relationship to police in July 2018. She participated in a recorded pretext call with Cash on July 6, 2018, which was played for the jury. During the call, Doe discussed their sexual activities and her loss of virginity, and Cash did not deny any part of the relationship. When Doe asked if he loved her, Cash said, "Yes, [Jane]. I wouldn't have risked my career, my life, and my livelihood if I didn't." He later admitted it was a "very bad decision" of his as he could have lost his job or landed in jail. He also said he would not have "put [his] life and [his] career on the line just to get a nut."

A detective testified that Doe's description of Cash's penis matched photographs of his genitals that police obtained through a warrant.

## II. Defense case

The defense called one witness, M., who was the girls' varsity basketball coach at Ridgeview during Cash's tenure at the school. M. testified that he knew Cash as a friend. He stated that Cash was the junior varsity coach and the assistant varsity coach. M. testified that he often drove Cash to and from practices in 2011 and 2012 because Cash had "car problems from time to time."

M. was a mandated reporter, and he would have "immediately reported" any suspected impropriety between a coach and player. He never had any reason to believe Cash was carrying on a relationship with an underage student.

4.

M. was very familiar with the school's facilities and did not believe there were any private or secluded places on campus. He "ran a pretty tight ship dealing with the girls." He always had a team mom present to help with the girls so that at no time were the coaches ever alone with the girls. But he was not with Cash 100 percent of the time.

## DISCUSSION

The People contend Cash forfeited all of his appellate claims by failing to object below. Cash contends that, to the extent any of his claims are deemed forfeited, his counsel was ineffective for failing to object. We will reject all of Cash's claims on their merits and thus need not address forfeiture.

## I.     Comments on the burden of proof

Cash first contends the trial court made comments during voir dire that were likely reasonably understood by the jury as allowing a conviction if the defense failed to rebut the prosecution's case. During voir dire, the trial court asked a prospective juror if "the defense [has] to do anything," and the juror replied, "Well, he should." The court responded, "Well, that's a different story. I agree with that, but does he have to?" The juror said no. Cash asserts that in this exchange the court's agreement with the juror had the effect of shifting the burden of proof to the defense. But the broader context of voir dire shows this is a misreading of the court's comments.

Relatedly, Cash argues the trial court committed instructional error by making comments that equated proof beyond a reasonable doubt to everyday decision making. But context also shows this was not the case.

### A.     Background

A large amount of factual background is necessary as context for analyzing Cash's claims.

5.

### 1. Voir dire comments

During voir dire, the trial court stated it would read the reasonable doubt instruction to the venire, "comment on [it]," and then "quiz" them on it. The court proceeded:

> "I will now explain the presumption of innocence and the People's burden of proof. The defendant has pled not guilty to the charges. The fact that a criminal charge has been filed against the defendant is not evidence that the charge is true. You must not be biased against the defendant because he has been arrested, charged with a crime, or brought to trial.

> "A defendant in a criminal case is presumed innocent. This presumption requires the People to prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt.

> "Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.

> "In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty.

> "I'm just going to highlight each of these paragraphs.

> "The first paragraph to me is a—focuses on that the charges are not evidence. The fact that the defendant is before you is not evidence.

> "The second paragraph talks about the presumption of innocence. He is presumed innocent. The burden of proof rests upon the prosecution. That burden of proof never changes. It never shifts to the defendant.

> "The third paragraph talks about how the burden of proof is beyond a reasonable doubt to an abiding conviction, but it doesn't have to eliminate all possible or imaginary doubt.

> "The last paragraph states that at the end of the trial, if after you've considered all the evidence, that burden of proof has not been met beyond a

6.

reasonable doubt to an abiding conviction, you must find the defendant not guilty because he's presumed innocent and the burden of proof has not been met. So that's my summary of it.

"[¶] … [¶]

"The defendant has a right not to testify. He might give up that right and choose to testify. That's entirely up to him. It doesn't change the burden of proof. It doesn't shift the burden of proof. If he doesn't testify, the fact that he didn't testify can't even be considered in your deliberations because it's not evidence of anything. Your decision has to be based upon the proof that is presented here in the court.

"… But this is a court of law and the opportunity to defend yourself is here, but the rules of evidence and the presumption of innocence, the burden of proof change how the process is done. You as jurors have to follow this process of how we go through the burden of proof and that the prosecution has that burden and the defense has none, and you have to be comfortable with the idea of making a decision on the evidence that you are given that is presented to you in this particular matter."

During defense counsel's questioning of the venire, he asked one of them if they thought Cash had to prove he is not guilty. The prospective juror said, "Well, it's really not him that has to prove that he's guilty or not guilty. It's up to his lawyers and the people helping him that need to prove and present facts so we can make our decision from there, because as of this point, he's innocent. He is not guilty." Defense counsel said that answer gave him the idea of a hypothetical to present to that prospective juror. The following occurred:

"[DEFENSE COUNSEL]: Let's say during the course of this trial I, as Mr. Cash's attorney, don't do anything. Let's say I show up to court. Maybe my tie's done. Maybe it's not. Hopefully it's there. Let's say I sit there. I'm obviously on my phone under the desk for most of the trial. You know, maybe I'm on Amazon because there's a good sale going on. [¶] … [¶] And let's say during the course of the trial, people keep looking over at me and say, Mr. Jossenberger,[2] what are you doing? Because, again, I'm his attorney. And let's say it's my turn to cross-examine a witness and I

---

[2] This was defense counsel's last name.

7.

look up and say, no questions. Thank you, and go back to the magazine I have open on the desk."

"[THE PROSPECTIVE JUROR]: Then I would be, like, maybe he needs to get a new lawyer.

"[DEFENSE COUNSEL]: I think that would be fair.

"[THE PROSPECTIVE JUROR]: Because you're—you know, the lawyer's not paying attention to what he should be paying attention to. He should be presenting. He should be helping his client.

"[DEFENSE COUNSEL]: Let me finish the hypothetical. I'm sorry. I was implying a certain hypothetical but it's a two-parter.

"Here's the second part. Now, evidence closes, and you hear all the evidence. You are still not convinced beyond a reasonable doubt that Mr. Cash did what he's accused of. Does my performance matter?"

The prospective juror explained that they "would want to hear more from the evidence on [the defendant's] side too[.]"

Defense counsel asked another prospective juror:

"[DEFENSE COUNSEL]: Let's say the same question. Let's say during the course of the trial I just—you know, I'm checked out. It's pretty obvious I'm checked out. If at the close of the evidence you don't believe that Mr. Cash did what he did beyond a reasonable doubt or did what he's accused of doing beyond a reasonable doubt, do you consider my performance in your decision?

"[THE PROSPECTIVE JUROR]: No.

"[DEFENSE COUNSEL]: How would you vote in that circumstance or what decision would you come to if you don't believe?

"[THE PROSPECTIVE JUROR]: Well, I would hope you would say something because then I would only have I feel like one side of the argument. What about the other side? I wouldn't—I would hope you would say something.

"[DEFENSE COUNSEL]: And let me stick with you a little bit more, if I may.

"Again, do you think he has to prove anything.

8.

"[THE PROSPECTIVE JUROR]:  No.  Because I think it's his job.

"[DEFENSE COUNSEL]:  Yeah.  And just moving on down the line.

"What do you think?  Let's say the same scenario.  I just—you know—I'm checked out.  I'm on Pluto as far as you're concerned, and when it's time to deliberate you don't believe beyond a reasonable doubt that Mr. Cash did what he was accused of.  How would you vote?

"[A DIFFERENT PROSPECTIVE JUROR]:  I would have to vote not guilty.

"[DEFENSE COUNSEL:   Why not guilty?

"[THE DIFFERENT PROSPECTIVE JUROR:  Because if the evidence isn't there, it doesn't matter whether you did anything or not.  If he can't prove that he did it, then you've got to vote not guilty."

After the prosecutor questioned the venire some, the trial court engaged in a colloquy with one of them:

"[THE COURT]:  You understand that the burden of proof rests upon the prosecution?

"[THE PROSPECTIVE JUROR]:  Yes.

"[THE COURT]:  You understand that the defense—that burden never changes?

"[THE PROSPECTIVE JUROR]:  Yes.

"[THE COURT]:  And the law provides that if the defendant does not testify, you cannot consider that in your deliberation?

"[THE PROSPECTIVE JUROR]:  Correct.

"[THE COURT]:  And that you understand the defense has no obligation to present any evidence?  You understand that?

"[THE PROSPECTIVE JUROR]:  Correct."

Later, the trial court asked another juror:

"[THE COURT]:  If you had to vote right now based upon the reasonable doubt instruction, what would your verdict be?

9.

"[THE PROSPECTIVE JUROR]: It would have to be not guilty.

"[THE COURT]: Okay. Why is that?

"[THE PROSPECTIVE JUROR]: Because he hasn't been proven guilty.

"[THE COURT]: Right. Burden's on the prosecution; right?

"[THE PROSPECTIVE JUROR]: Right.

"[THE COURT]: Does the defense have to do anything?

"[THE PROSPECTIVE JUROR]: Well, he should.

"[THE COURT]: Well, that's a different story. I agree with that, but does he have to?

"[THE PROSPECTIVE JUROR]: No.

"[THE COURT]: Okay.

"You understand that at the end of the case, the defense can do nothing and he can say, ladies and gentlemen, it hasn't been proved, and he can sit back down, and if you agree with him, your verdict would be not guilty?

"[THE PROSPECTIVE JUROR]: Right.

"[THE COURT]: Okay. If it hasn't been proven. Is that something you feel comfortable with?

"[THE PROSPECTIVE JUROR]: If he hasn't done anything to help his client? I feel very uncomfortable with that.

"[THE COURT]: But could you still follow the law that places the burden on the prosecution?

"[THE PROSPECTIVE JUROR]: I think I could.

"[THE COURT]: Okay.

"Any reason you could think of why you couldn't be a fair and impartial juror?

"[THE PROSPECTIVE JUROR]: No."

The next day of jury selection, defense counsel asked a different prospective juror:

"[DEFENSE COUNSEL]: Now do you remember the example I gave on Thursday where I basically said assume I do nothing and—well, let's say throughout the course of the trial I don't do much, if anything. Let's say it looks like I'm just here for a paycheck or I'm just [here] because I have nowhere else to go. And throughout the course of the trial witnesses come, the People call witnesses. Judge asks me "Mr. Jossenberger, cross?" and I just look up and say, "No, I'm good." You see me obviously on my phone. You see the little glow. You see changing colors. There may be a YouTube video going on down there. At the end of the evidence you're thinking man that guy did a terrible job. Hopefully you're thinking that. If you're still not convinced beyond a reasonable doubt, how do you vote in that circumstance?"

"[THE PROSPECTIVE JUROR]: Well, the fact that no defense was offered doesn't change my opinion of whether—the wisdom of that decision. It's up to the People to prove the evidence beyond a reasonable doubt. If that has occurred then I will vote guilty but if it has not occurred it's not guilty.

"[DEFENSE COUNSEL]: So if I may paraphrase, and hopefully I'm not putting words in your mouth. If the defense doesn't do anything and you're still not convicted that the case has been proven beyond a reasonable doubt it's still not guilty to you in that circumstance?

"[THE PROSPECTIVE JUROR]: Yes."

Defense counsel asked yet another prospective juror:

"Let's say I do nothing and let's say during the course of the trial you look up and again you see me obviously checked out. Let's say I'm taking a nap. Like I'm just gone. My face is down. I'm snoring awake. Every time something happens you see the [disdain on] all the court staff's faces having to deal with me again. At the end of evidence you see all that and I don't do anything, I don't cross-examine any witness, and I don't put on a defense. I don't even try. Not only do I not put on a defense, I don't cross-examine. I'm just not present. I'm wherever I am. What do you do at the end of it if you're still not convinced beyond a reasonable doubt that these alleged crimes occurred?"

The prospective juror said they would have to vote not guilty "even if you were taking a nap."

Finally, defense counsel asked a final prospective juror, "Now let's say I don't do anything during the course of the trial. What do you do in that scenario if you don't believe the case has been proven beyond a reasonable doubt?" The prospective juror replied that Cash would be "not guilty regardless [of] what you've done." Defense counsel then asked if Cash had "to do anything in his own defense," and the prospective juror said, "No."

### 2. *Jury instruction comments*

Cash also complains of comments the trial court made while instructing the jury before closing arguments. The comments came after the court had read all of the instructions to the jury except for the instructions on the elements of the three offenses with which Cash was charged. The court read to the jury the instruction on the presumption of innocence and reasonable doubt, the same one the court read during voir dire. The jury was also instructed that Cash had "an absolute constitutional right not to testify" and that he "may [rest] on the state of the evidence and argue that the People have failed to prove the charge beyond a reasonable doubt." Right before the court read the instructions on the three offenses with which Cash was charged, the court stated:

> "Now ladies and gentlemen, we're going to get into the specific elements of the charges before you. And I would suggest by way of comment on the instructions that I already read to you to give some thought to this comment made by a Supreme Court Justice years ago, and that is the law is based on human experience. And I think if you go over most of the instructions I gave—I have just read to you, most of those instructions should [resonate] with any of us. They make sense to us. Some of them don't. Some are obeys on our legal system. I will remind you of the reasonable doubt instruction. Prove beyond a reasonable doubt to an abiding conviction, but most of the instructions comment on the law often coincide with what we experienced as humans. So I suggest to you the law is not something that is foreign. It is something that we grow up with in our society. And I think all of us have an understanding of what is fair and not fair, and our legal system, in, my opinion tries to codify that. And these instructions are what represent that. So remember as you go back to

deliberate, these are the instructions that guide your deliberations because this is the law."

**B.     Law and analysis**

The test for analyzing comments from the trial court on the burden or standard of proof is whether there is a reasonable likelihood the jury misconstrued or misapplied the words.  (*People v. Clair* (1992) 2 Cal.4th 629, 662–663 (*Clair*).)

**1.     *Voir dire comments***

Cash contends the trial court's agreement with a prospective juror that the defense should do something made it reasonably likely that the jury understood that it could convict Cash based on the defense's failure "to sufficiently rebut the prosecution's case." This contention misreads the interaction between the court and prospective juror, especially in the broader context of voir dire as a whole.

The context of defense counsel's exaggerated hypotheticals provides a critical lens through which to interpret the prospective juror's comments and the court's agreement. Counsel repeatedly presented the hyperbolic scenarios to illustrate that the defense's inaction does not affect the prosecution's burden of proof and that the jurors could not hold counsel's performance against the defendant.  The scenarios portrayed counsel as engaging in egregiously poor conduct—e.g., sleeping, shopping online, being checked out—to provoke a reaction, highlighting what any reasonable person would view as a dereliction of professional duty.  The prospective juror's expression that "the defense" should do something was grounded in the context of these hypotheticals.  This context shows the prospective juror's focus was on the conduct of defense *counsel*, not the defendant.  The juror's comment is most reasonably understood as expressing a common-sense moral judgment—that defense counsel should provide minimal assistance to the defendant in some capacity.  This sentiment reflects an expectation of professional diligence, not a misunderstanding of the legal burden of proof.  The juror was not

13.

asserting that defense counsel must actively refute the prosecution's case or present evidence.

When the trial court agreed with the juror's comment, it was tacitly acknowledging the juror's reasonable expectation of professionalism without suggesting that the defense had a legal duty to act. Importantly, the court immediately followed up by confirming that (1) the defense is not required to present any evidence and (2) that the burden of proof always rests with the prosecution. Indeed, the court repeatedly and emphatically explained these legal principles throughout voir dire and in the instructions during trial.

In reviewing the exchange between the prospective juror and the trial court within the broad context of voir dire, it is clear that the court did not misrepresent the burden or standard of proof.

### 2. *Jury instruction comments*

Cash contends that the trial court's comment to the jury before instructing on the elements of the charged offenses undermined the reasonable doubt standard by equating it to everyday decision making. In our view, Cash misreads the court's intent and the overall context of the comments.

The court's comments, viewed in their entirety, were aimed at getting the jury to understand the law as something grounded in common sense and fairness. Consider the comments that "most of the instructions should resonate with any of us" and "the law is not something that is foreign." These comments framed the legal system as accessible and not abstract or esoteric. They did not reasonably suggest that the reasonable doubt standard itself is reducible to a casual decision-making process. There is no reasonable likelihood the jury misconstrued or misapplied the court's comments.

## II. Right against self-incrimination

"[T]he privilege against self-incrimination of the Fifth Amendment prohibits any comment on a defendant's failure to testify at trial that invites or allows the jury to infer

guilt therefrom, whether in the form of an instruction by the court or a remark by the prosecution." (*Clair, supra,* 2 Cal.4th at p. 662.) The test for reviewing comments about the privilege is the reasonable likelihood standard, under which we inquire "whether there is a reasonable likelihood that the jury misconstrued or misapplied the [comments] in violation of [the privilege]." (*Id.* at p. 663.)

Cash contends that "the court's concurrence with [a prospective] juror's opinion that the defense should do something to rebut the prosecution's case" made it "reasonably likely that a juror considered [Cash's] failure to testify that he did not commit the offenses was an important circumstance to consider in reaching a verdict." We reject this contention for largely the same reasons we rejected his other claims.

As we explained, the trial court's agreement with the juror's expression that the defense should do something was a general acknowledgment of a layperson's expectations of a defense team's role in a trial. This could not reasonably be equated with the defendant personally needing to testify, especially since the court repeatedly emphasized that Cash's right to remain silent was absolute and his silence could not be used against him.

Also, the prospective juror did not specifically express that Cash should testify. The court asked if the defense had to do "anything," and the juror replied that "he should." "Anything" encompasses a broad range of defense actions beyond calling the defendant to the stand, such as delivering an opening statement and closing argument, cross-examining prosecution witnesses, and calling other defense witnesses. Thus, the court's statement, even if misconstrued by a prospective juror, was not a directive that Cash had to take the stand. And since defense counsel conducted an opening and closing, cross-examined Jane Doe, and called a defense witness, the jurors observed a robust defense effort, making it unlikely they would conflate the hypothetical inaction discussed during voir dire with the reality of the trial.

## III.    Jury coercion

On the first day of jury selection, which was October 20, 2022,[3] the court told the panel of prospective jurors that the trial would conclude no later than Friday, November 4.

After closing arguments and pre-deliberation instructions, the jury began deliberations at 2:09 p.m. on October 25.  The next morning, at 11:50 a.m., the jury sent the court a note requesting guidance on filling out the verdict forms and adding that it was hung on counts 1 and 2, but unanimous on count 3.  After lunch, the court read CALCRIM No. 3551 to the jury and added the last paragraph, which is not part of the instruction.

> "You have made reasonable efforts at this point, but I do have a further instruction to read to you at this time, and the instruction is simply titled Further Instruction About Deliberations.
>
> "Sometimes juries that have had difficulty reaching a verdict are able to resume deliberations and successfully reach a verdict on one or more counts.  Please consider the following suggestions:
>
> "Do not hesitate to reexamine your own views.  Fair and effective jury deliberations require a frank and forthright exchange of views.
>
> "Each of you must decide the case for yourself and form your individual opinion after you have fully and completely considered all of the evidence with your fellow jurors.  It's your duty as jurors to deliberate with the goal of reaching a verdict if you can do so without surrendering your individual judgment.  Do not change your position just because it differs from that of other jurors or just because you or others want to reach a verdict.  Both the People and the Defendant are entitled to the individual judgment of each juror.
>
> "It's up to you to decide how to conduct your deliberations.  You may want to consider new approaches in order to get a fresh perspective.
>
> "Let me know whether I can do anything to help you further, such as give additional instructions or clarify instructions I have already given you.

---

[3] Subsequent references to dates are to dates in 2022.

"Please continue your deliberations at this time. If you wish to communicate with me further, please do so in writing as you have already done.

"I will comment we're well within our estimate of the length of time that the trial would take; so I'm going to ask you to retire now and continue your deliberations, and I thank you for the efforts you have put in so far."

Defense counsel did not object to this instruction. Deliberations resumed and the jury returned guilty verdicts on all three counts 18 minutes later.

Based on the language of the last paragraph of the above instruction, Cash contends "[t]he court coerced the jury to reach a verdict by threatening to keep them deliberating" through to November 4 "if they did not reach a verdict." There was no coercion.

Once a case has been submitted to a jury for decision, the jurors generally cannot be discharged until they have agreed upon a verdict unless the parties consent or unless, "at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree." (§ 1140.) When the jury reports it cannot agree on a verdict, the trial court has discretion to declare a hung jury or to order further deliberations. (*People v. Lopez* (2018) 5 Cal.5th 339, 364.) Among the authorized tools for helping the jury to overcome an impasse are giving additional instructions and permitting additional closing arguments by counsel. (Cal. Rules of Court, rule 2.1036(b)(1), (3).) "However, a court must exercise its power under section 1140 without coercing the jury, and 'avoid displacing the jury's independent judgment "in favor of considerations of compromise and expediency." ' " (*People v. Brooks* (2017) 3 Cal.5th 1, 88.) "Any claim that the jury was pressured into reaching a verdict depends on the particular circumstances of the case." (*People v. Pride* (1992) 3 Cal.4th 195, 265 (*Pride*).)

Cash's contention that the court coerced jurors to reach a verdict is a misreading of the judge's statement. The court's comment, "we're well within our estimate of the length of time that the trial would take," was a neutral observation that the trial had not

yet exceeded its outside end date of November 4.  The court did not state or imply that the jurors would be required to deliberate indefinitely or until November 4.  Indeed, the court told the jurors that it was their duty "to deliberate with the goal of reaching a verdict *if you can*."  This made clear that the jurors were not compelled to reach a verdict.[4]

**DISPOSITION**

The judgment is affirmed.

SNAUFFER, J.

WE CONCUR:

DETJEN, Acting P. J.

DE SANTOS, J.

---

[4] Since we have rejected all of Cash's claims of error, his claim of cumulative error fails.